## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Action No.: 19-cr-00199-RM

UNITED STATES OF AMERICA,

        Plaintiff,

v.

1.  Emilio Testa,
    a/k/a Emilio Harper
    a/k/a Emilio Ric
    a/k/a Emilio Riccardo,

        **Defendant.**

---

## PLEA AGREEMENT

---

The United States of America, through Jason R. Dunn, United States Attorney for the District of Colorado, Hetal J. Doshi, Assistant United States Attorney, and the defendant, EMILIO TESTA, personally and by counsel, Natalie Stricklin, Assistant Federal Defender, hereby submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1.

## I.  **AGREEMENT**

### A.    *Defendant's Obligations*

####        1.    *Guilty Plea*

The defendant agrees to plead guilty to the sole count of the Information, charging a violation of 18 U.S.C. § 1956(a)(3)(B), sting money laundering.

1

Court's Exhibit

1

2.    *Waiver of Appeal*

The defendant is aware that 18 U.S.C. § 3742 affords the right to appeal the

sentence, including the manner in which that sentence is determined.  Understanding

this, and in exchange for the concessions made by the government in this agreement,

the defendant knowingly and voluntarily waives the right to appeal any matter in

connection with this prosecution, conviction, or sentence unless it meets one of the

following criteria: (1) the sentence exceeds the maximum penalty provided in the statute

of conviction; (2) the sentence exceeds the advisory guideline range that applies to a

total offense level of 17; or (3) the government appeals the sentence imposed.  If any of

these three criteria apply, the defendant may appeal on any ground that is properly

available in an appeal that follows a guilty plea.

The defendant also knowingly and voluntarily waives the right to challenge this

prosecution, conviction, or sentence in any collateral attack (including, but not limited to,

a motion brought under 28 U.S.C. § 2255).  This waiver provision does not prevent the

defendant from seeking relief otherwise available in a collateral attack on any of the

following grounds: (1) the defendant should receive the benefit of an explicitly

retroactive change in the sentencing guidelines or sentencing statute; (2) the defendant

was deprived of the effective assistance of counsel; or (3) the defendant was prejudiced

by prosecutorial misconduct.

3.    *Admission of Forfeiture*

The defendant further agrees to forfeit to the United States immediately and

voluntarily any and all assets and property, or portions thereof, subject to forfeiture,

2

pursuant to Title 18, United States Code, Section 982(a)(1), whether in the possession or control of the United States or in the possession or control of the defendant or defendant's nominees, or elsewhere. The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil, and/or administrative forfeiture action, and further agrees to waive any and all administrative forfeiture deadlines.

Defendant specifically agrees to forfeit $24,100, in the form of a money judgment, which he agrees are the proceeds of the May 16, 2018 transaction giving rise to the count of conviction. The defendant agrees that he will not object to this Court entering a preliminary order of forfeiture for the $24,100 in proceeds pursuant to Rule 32.2(b)(2)(A) of the Federal Rules of Criminal Procedure. The defendant consents pursuant to Rule 32.2(b)(4)(A) of the Federal Rules of Criminal Procedure that the preliminary order of forfeiture shall be final as to him at the time it is entered notwithstanding the requirement that it be made a part of the sentence and be included in the judgment. Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this Court may impose upon the defendant in addition to forfeiture.

### B. Government's Obligations:

1. *No Additional Charges Based on Known Conduct*

The U.S. Attorney's Office for the District of Colorado agrees not to pursue any additional charges against the defendant based on conduct known to date to the U.S. Attorney's Office for the District of Colorado.

3

2.    *Recommendation of Full Credit for Acceptance of Responsibility*

Provided that the defendant does nothing inconsistent with accepting responsibility between the date on which he changes his plea to guilty and the date of sentencing, the government will recommend that the defendant receive the maximum reduction for acceptance of responsibility.

3.    *Government's Recommendation*

The government agrees to recommend a term of imprisonment at the low-end of the applicable advisory guideline range as calculated by the Court.

## II.  ELEMENTS OF THE OFFENSE

The parties agree that the elements of the offense to which the defendant will plead guilty are as follows:

**First**:  The defendant conducted a financial transaction;

**Second**:  The financial transaction involved property that was represented by a law enforcement officer or person acting at the direction of, or with the specific approval of, an agent of the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI) to be the proceeds of narcotics trafficking;

**Third**:  The financial transaction was believed by the defendant to be the proceeds of narcotics trafficking; and

4

**Fourth**:  The defendant conducted the financial transaction with the intent to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of narcotics trafficking.

10th Cir. P.J.I. § 2.73.2 (2011).

The term "financial transaction" means a transaction that in any way or degree affects interstate or foreign commerce, and that involves:  (i) the movement of funds by wire or other means; or, *inter alia*, (ii) one or more monetary instruments.  *See* 18 U.S.C. § 1956(c)(4).  An exchange of virtual currency such as Bitcoin for United States dollars is a "purchase, sale, … transfer, delivery, or other disposition[]" and is, therefore, a "transaction."  18 U.S.C. § 1956(c)(3).  Narcotics trafficking is a specified unlawful activity.  18 U.S.C. §§ 1956(c)(7)(A); 1961(1)(A); 1961(1)(D).

## III.  STATUTORY PENALTIES

The maximum statutory penalty for a violation of 18 U.S.C. § 1956(a)(3)(B) is not more than 20 years of imprisonment; a fine of not more than $250,000 or not more than the greater of twice the gross pecuniary gain or twice the gross pecuniary loss resulting from the offense, or both a fine and imprisonment; not more than 3 years supervised release; and a $100 special assessment fee.

If a term of probation or supervised release is imposed, any violation of the terms and/or conditions of supervision may result in an additional term of imprisonment.

## IV.  COLLATERAL CONSEQUENCES

This felony conviction may cause the loss of civil rights including, but not limited to, the rights to possess firearms, vote, hold elected office, and sit on a jury.  For a

5

defendant who is an alien, the conviction may cause the defendant to be deported and removed from the United States, to be denied admission to the United States, and to be denied citizenship.

## V.  STIPULATION OF FACTS

The parties agree that there is a factual basis for the guilty plea that the defendant will tender pursuant to this plea agreement.  That basis is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are pertinent to those considerations and computations.  To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from hereafter presenting the Court with additional facts which do not contradict facts to which the parties have stipulated and which are relevant to the Court's guideline computations, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

The parties stipulate and agree as follows:

On April 5, 2016, an individual using the web-based platform Localbitcoins.com contacted an HSI agent who was working in an undercover capacity as a Bitcoin exchanger on the same website.  The individual said he had a friend "Emilio" who was looking to conduct Bitcoin exchanges, and provided contact information for "Emilio" later identified as the defendant, Emilio Testa.  After that introduction, an undercover HSI

6

agent contacted Testa, and they agreed to meet for the first time on April 20, 2016. During this meeting, Testa, who was accompanied by his girlfriend, explained that he had an organic produce business in Australia, and preferred not to use banks and be bothered by taxes. Testa said that he needed to exchange U.S. dollars for Bitcoin. The HSI undercover explained that s/he would charge a 10% fee for Bitcoin and U.S. dollar conversions or trades, and as trust developed, the rate could drop to 7.5%. No exchange occurred at this meeting.

On two occasions in 2016, Testa and an undercover agent met and exchanged Bitcoin for cash ($7700 and $6750, respectively), but those exchanges were not the result of the undercover agent expressing a need to "clean" or otherwise dispose of cash from a specified unlawful activity. Testa and undercover agents maintained contact in 2017. During that time, Testa and the undercover agents discussed meeting to conduct additional exchanges of cash for Bitcoin, but most of those exchanges did not occur. Testa did arrange for an exchange of Bitcoin for Australian dollars in Australia on behalf of a friend, but like the other exchanges in 2016, that exchange was not predicated on the need to launder or "clean" money sourced from unlawful activity. Also, in March 2017, Testa and an undercover agent met to exchange the undercover agent's $18,620 in cash for an equivalent amount of Testa's Bitcoin. This exchange was not the result of the undercover agent expressing a need to "clean" or otherwise launder funds from a specified unlawful activity.

Testa and undercover agents maintained contact in 2018, especially as Testa was attempting to launch an initial coin offering (ICO) with some other individuals. That offering was unsuccessful.

On March 5, 2018, Testa contacted an undercover agent and discussed a transaction to occur the next day where he sought to sell $5,000 of Bitcoin for an equivalent amount of U.S. dollars. This transaction was consummated on March 6, 2018, in a face-to-face meeting in Boulder attended by Testa, his girlfriend, and the undercover agent. The HSI undercover agent represented that the money used in the March 5, 2018 financial transaction involved property that was the proceeds of narcotics trafficking. Specifically, the undercover agent commented on having "a cash problem"; Testa responded with a laugh. The undercover agent further advised that the money being used in the exchange that day was not "clean" money and that money was exchanged that way, or gotten rid of, simply to place extra layers between the undercover agent and the true "dirty" source of the funds. Later during that same meeting, Testa inquired as to what the undercover agent's spouse did for a living. The undercover agent responded that the purported spouse does security work and sells drugs; the undercover agent further stated that they cannot go to the bank with the drug money and that the undercover agent prefers not to deal with the spouse's customers which is why the undercover agent handles the exchange of money.

During the March 5, 2018 meeting, Testa and the undercover agent first conducted a small test transaction where Testa transferred or caused to be transferred .0001 Bitcoin to the undercover agent's digital wallet. That test transaction was

8

successful. Then, in a second transaction, Testa transferred or caused to be transferred .459 Bitcoin in exchange for the $5,000 in cash represented by the undercover agent to be the proceeds of narcotics trafficking. These two transactions are financial transactions because they involved the movement of funds by wire or other means and because the transactions involved one or more monetary instruments, namely U.S. dollars. Testa believed the financial transactions involved proceeds of narcotics trafficking, and he conducted the financial transactions with the intent to conceal or disguise the nature, location, source, ownership or control of property he believed to be the proceeds of narcotics trafficking.

Testa and undercover agents continued to stay in contact. On May 16, 2018, Testa and an undercover agent agreed to meet to conduct a transfer of Bitcoin for $26,000 in cash. Testa, his girlfriend, and this undercover agent, who was purportedly the spouse of the undercover agent that Testa had met in March 2018, met in person to conduct the transaction. During the meeting, the undercover agent handed Testa and his girlfriend $26,000 in cash. Testa and the undercover agent completed three transactions into the undercover agent's digital wallet. In the first test transaction, Testa transferred or caused to be transferred .0001 Bitcoin to the agent's digital wallet. After this first test transaction, the HSI undercover agent represented that the money used in the May 16, 2018 financial transaction involved property that was the proceeds of narcotics trafficking. Specifically, the undercover agent showed Testa and his girlfriend four photographs on the agent's phone. The photographs depicted kilograms of cocaine shrink-wrapped in cellophane. The agent informed TESTA and his girlfriend

9

that he had recently sold the kilograms of cocaine.  Testa replied to the photos, "beauty."

In the second transaction on May 16, 2018, Testa transferred or caused to be transferred 2.788 Bitcoin to the agent's digital wallet.  In the third transaction, Testa transferred or caused to be transferred .1335 Bitcoin to the agent's digital wallet. Because of some complications with Testa's electronic wallet containing the Bitcoins and the exchange rates for Bitcoins and U.S. dollars, Testa was only able to transfer the Bitcoin equivalent of $24,100 to the undercover agent's electronic wallet, even though the original deal was for $26,000 of Bitcoin.  Because the undercover agent had given $26,000 of money represented to be proceeds of narcotics trafficking to Testa and his girlfriend, Testa returned $1900 back to the undercover agent. During this same meeting, the undercover agent discussed selling two more kilograms of cocaine that day, and potential future transactions with Testa from the cash resulting from those drug deals.  Testa responded that he would ask around if anyone needed to cash out, and said he might need to do a larger deal with the undercover agent in the coming weeks.

These three transactions conducted on May 16, 2018, are financial transactions because (1) they involved the movement of funds, U.S. dollars as well as virtual currency, by wire or other means and (2) because the transaction involved one or more monetary instruments, namely U.S. dollars.  Testa believed the financial transactions involved proceeds of narcotics trafficking, and he conducted the financial transactions with the intent to conceal or disguise the nature, location, source, ownership or control of property he believed to be the proceeds of narcotics trafficking.

On June 14, 2018, Testa met in person with two undercover agents. One of the two agents was known to Testa, but the other undercover agent was introduced to Testa as the known undercover agent's purported source of drug supply in Mexico. They discussed problems that Testa's friends were having moving drugs in and out of Australia. They discussed Testa potentially purchasing drugs from the undercover agent, but Testa expressed uncertainty given the problems Testa's friends were having moving drugs in and out of Australia. During this meeting, the undercover agent that was new to Testa asked how Testa could help the undercover agent with his money. When specifically asked by the undercover agent what would happen if he provided Testa with $100,000, Testa responded that "hypothetically ... we move that [cash] into Bitcoin or to Monero and wash the coins. So then, there's no leads to where it's come from." They continued to discuss how there are products that can be used to "wash" virtual currency to get clean coins, and then cash out. No transactions occurred during this meeting.

In October 2018, undercover agents discussed a possible transaction with Testa, but no other transactions occurred.

## VI. ADVISORY GUIDELINE COMPUTATION AND 18 U.S.C. § 3553 ADVISEMENT

The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. To aid the Court in this regard, the parties set forth below

11

their estimate of the advisory guideline range called for by the United States Sentencing Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

A. Pursuant to U.S.S.G. § 2S1.1(a)(2), the base offense level is **8** plus **4** for because the value of the laundered funds ($29,100 ($5000 + $24,100)) is more than $15,000 but less than $40,000.[1]

B. The following specific offense characteristics apply. A **6**-level increase applies because the defendant knew or believed that any of the laundered funds were proceeds of an offense involving the manufacture, importation, or distribution of a controlled substance. *See* § 2S1.1(b)(1). A **2**-level increase applies because the defendant was convicted under 18 U.S.C. § 1956. *See* § 2S1.1(b)(2)(B).

C. There are no victim-related, role-in-offense, obstruction and/or multiple count adjustments.

D. The adjusted offense level therefore would be **20**.

E. The defendant should receive a 3-level adjustment for acceptance of responsibility under § 3E1.1. The resulting, total offense level therefore would be **17**.

F. The parties understand that the defendant's criminal history computation is tentative. The criminal history category is determined by the Court based on the

---

[1] The base offense level of **8** plus **4** for the value of the laundered proceeds are used here because the defendant did not commit the underlying offense from which the laundered funds were represented to be proceeds, and because the offense level for that offense cannot be determined given the indefinite nature of the amount of narcotics purportedly generating the proceeds being laundered. *See* U.S.S.G. § 2S1.1(a)(1) and § 2D1.1.

defendant's prior convictions.  Based on information currently available to the parties, it is estimated that the defendant's Criminal History Category would be **I.**

G.    Assuming the criminal history facts known to the parties are correct, the career offender/criminal livelihood/armed career criminal adjustments would not apply.

H.    Imprisonment:  The advisory guideline range of imprisonment resulting from an offense level of **17** and the above criminal history category is **24-30 months**. However, in order to be as accurate as possible, with the criminal history category undetermined at this time, the offense level estimated above could conceivably result in a range from **24-63 months**.

In any event, the guideline range would not exceed the cumulative statutory maximum applicable to the count of conviction.

I.    Fine:  Pursuant to guideline § 5E1.2, assuming an estimated offense level of **17**, the fine range for this offense would be **$10,000 to $95,000**, plus applicable interest and penalties.

J.    Supervised Release:  The guideline range of supervised release under § 5D1.2 is at least one year but not more than three years.

The parties understand that although the Court will consider the parties' guideline estimate, the Court must make its own determination of the applicable guideline range. In doing so, the Court is not bound by the position of any party.  The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory

13

guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VII.   ENTIRE AGREEMENT

This document, including supplements, if any, states the parties' entire agreement.  There are no other promises, agreements (or "side agreements"), terms, conditions, understandings, or assurances, express or implied.  In entering this agreement, neither the government nor the defendant has relied, or is relying, on any terms, promises, conditions, or assurances not expressly stated in this agreement.

Date: 6/13/19

Emilio Testa
Defendant

Date: 6/13/19

Natalie Stricklin
Attorney for the Defendant

Date: 6/13/19

Hetal J. Doshi
Assistant United States Attorney

14